IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| HUNTER MULLEN, III, | ) | 4:11CV3021 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER ON DEFENDANT'S** |
| ERIC K. SHINSEKI, Secretary of the | ) | **MOTION FOR SUMMARY** |
| Department of Veterans Affairs, | ) | **JUDGMENT** |
| | ) | |
| Defendant. | ) | |

This matter is before me on Defendant Eric K. Shinkseki's ("Shinseki") Motion for Summary Judgment. (Filing No. 53.) As set forth below, Shinseki's motion is granted.

## I. BACKGROUND

The Plaintiff Hunter Mullen, III, ("Mullen") filed his Complaint on February 22, 2011. (Filing No. 1.) Mullen alleged discrimination, hostile-work-environment, and retaliation claims against Shinseki. Initially, Mullen was represented by counsel, but his counsel withdrew on January 17, 2012. (Filing No. 43.) Thereafter, Mullen proceeded without counsel.

Shinseki filed a Motion for Summary Judgment on June 25, 2012. (Filing No. 53.) He filed a brief and index of evidence in support of his motion. (Filing Nos. 54 and 55.) Mullen did not respond to Shinseki's motion, and the time in which to do so has now passed.

## II. STATEMENT OF MATERIAL FACTS

The party seeking the entry of summary judgment in its favor must set forth "a

separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law." NECivR 56.1(a)(1). If the non-moving party opposes the motion, that party must "include in its [opposing] brief a concise response to the moving party's statement of material facts." NECivR 56.1(b)(1). Such response must "address each numbered paragraph in the movant's statement" of facts and must contain pinpoint references to evidence supporting the opposition. *Id.* "Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response." *Id.* (emphasis in the original).

Shinseki set forth a statement of material facts in his brief, in accordance with the court's Local Rules. Shinseki also submitted evidence that was properly authenticated. I deem this matter fully submitted. In addition, I adopt the following undisputed material facts set forth by Shinseki.

## Background

1.      Mullen is an African-American male.

2.      Shinseki is Secretary of the Department of Veterans Affairs ("VA"), an agency of the United States of America, with operations in Grand Island, Nebraska.

3.      Mullen was hired by the VA on May 16, 1993. From 2009 to July 2010, he worked as a medical support assistant in a VA hospital in Grand Island, Nebraska ("Grand Island VA").

4.      The Grand Island hospital is part of the Nebraska-Western Iowa Health Care System.

5.      At all relevant times, Mullen's immediate supervisor was Deborah Carlson ("Supervisor Carlson"), a white female.

6.      Mullen was one of eight clerks supervised by Carlson. The eight clerks

were each assigned to one of three desks, known by their location as the southeast desk, the southwest desk, and the north desk. Mullen and one other clerk, Sue Foster ("Foster"), were assigned to the north desk. Mullen also provided backup support to the phone clerk, Bonnie White ("White").

7.      On June 3, 2009, the Grand Island VA implemented a new phone system for handling incoming calls. Two clerks were required to staff the new phone system at all times. Supervisor Carlson and Mary Miller ("Supervisor Miller"), Mullen's second-level supervisor, determined that the clerks from the north desk (i.e., Mullen and Foster) would rotate into the second position in the phone room.

8.      The Grand Island VA was required to meet threshold statistics on the new phone system, such as an abandonment rate of less than five percent. The clerks who worked the phone system were advised the phones could not be left unattended.

9.      Mullen's title, salary, and benefits did not change as a result of his rotation into the phone room.

**Mullen's Reprimand**

10.      On June 3, 2009, Mullen met with Supervisor Carlson to discuss his rotation into the phone room. During the meeting, Mullen's voice became loud and aggressive, which Supervisor Carlson perceived as threatening. In addition, Mullen slammed open a door as he left the meeting.

11.      On June 9, 2009, Mullen was assigned to work in the phone room. When Supervisor Carlson observed him working outside the phone room, she reminded him to return to his assigned work station. Mullen responded, "Are you fucking serious?" and "What the hell is wrong with you?"[1] Approximately 10 minutes later, Supervisor Carlson observed that Mullen was still not in the phone room, and had not sought permission to leave the phone room.

12.      On June 16, 2009, Mullen and White argued in the phone room. During the argument, Mullen stood up, got approximately 12 inches from White's face, and

---

[1]Mullen's deposition testimony is that he responded to Carlson's questions by stating, "This sucks" and "What the hell?" (Filing No. 54-7 at CM/ECF p. 6.)

stared down at her in an intimidating manner.  Supervisor Carlson reported this incident to the Grand Island VA police.

13.    On June 17, 2009, Supervisor Carlson met with Mullen and Union President Gloria Kortum ("Union President Kortum") to discuss his argument with White.  Supervisor Carlson ordered Mullen to treat other employees in a courteous and professional manner, and provided him with a brochure from the Employee Assistance Program ("EAP").  During the meeting, Mullen called Supervisor Carlson "racist" twice.

14.    Supervisor Carlson also met with White on June 17, 2009.  She ordered White to treat other employees in a courteous and professional manner, and provided her with an EAP brochure.  White responded respectfully to the verbal counseling.

15.    Following these meetings, Supervisor Carlson consulted with Human Resources Management Specialist Rhonda Cunningham ("HR Specialist Cunningham"), and decided to issue Mullen a proposed reprimand.  Her decision was based on his reaction to the verbal counseling on June 17, 2009, the increasing frequency of incidents he was involved in, and because she had already counseled him earlier in the year about exercising courtesy and dignity in the workplace.  She issued the proposed reprimand to Mullen on June 22, 2009.

16.    Supervisor Carlson learned on June 26, 2009, that Mullen had filed an informal EEO complaint against her.

17.    In accordance with VA policy, Supervisor Miller was the deciding official for the reprimand.  She reviewed Supervisor Carlson's proposed reprimand, and decided it was appropriate.  Supervisor Miller presented a reprimand to Mullen on July 7, 2009.

18.    Supervisor Carlson did not propose a reprimand of White because White had not been previously counseled about treating coworkers with respect, and because she responded respectfully to the verbal counseling.

**Mullen's Suspension**

4

19.     On July 29, 2009, Supervisor Carlson gave Mullen several instructions. Mullen responded to her instructions in an argumentative, loud, and disrespectful tone. At one point, Mullen stated, "That is who I am, I am not changing, I am doing my job, do you want me to quit?"

20.     On August 12, 2009, Supervisor Carlson verbally counseled Mullen in the presence of Union President Kortum about his failure to protect patient identifying information. All clerks, including Mullen, were required to comply with VA's privacy policy, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and Privacy Act statutes. During this meeting, Supervisor Carlson ordered Mullen to lower his voice. Mullen responded, "I won't do that, this is who I am" and "Who do you think you are?" Mullen also stated he did not need to be lectured. In addition, Mullen twice stated, "So I made a mistake, I'm human."

21.     On August 12 and 13, 2009, Supervisor Carlson observed what she believed were two additional security violations involving Mullen's failure to protect patient identifying information.

22.     On August 13, 2009, Supervisor Carlson met with Mullen and Union President Kortum. Supervisor Carlson asked Mullen to provide written information about the July 29, 2009, events, the security violations, and Mullen's reaction to verbal counseling on August 12, 2009. Mullen responded, "I won't do that, you can fire me."

23.     Between August 13, 2009, and September 1, 2009, Supervisor Carlson sent Employee/Labor Relations Specialist Jacqueline Bieker ("Bieker") reports of incidents involving Mullen. Based on these reports, Bieker recommended Mullen be suspended for 10 days for (1) insolent behavior toward a supervisor, (2) failure to follow a direct order by a supervisor, and (3) failure to safeguard confidential information in violation of the Privacy Policy and HIPAA. Bieker based her recommendation on guidance set forth in the VA Handbook.

24.     In accordance with VA policy, Supervisor Miller was the official to propose suspension. Supervisor Miller reviewed the proposed suspension, and issued a notice of proposed suspension to Mullen on September 15, 2009.

25.     Associate Director of Patient Care Eileen Kingston was the deciding official for the proposed suspension.  She reviewed the proposed suspension, and other relevant information, and determined a 10-day suspension was appropriate.

26.     Supervisor Miller presented the letter of suspension to Mullen on October 16, 2009.  He was suspended for ten days without pay from November 16, 2009, to November 25, 2009.

## Events Leading to Mullen's Termination

27.     On February 10, 2010, Supervisor Carlson received a report that Mullen failed to schedule an appointment for an anticoagulation patient before the patient left the north desk, in violation of VA procedures.  In addition, she received a report that Mullen made several inappropriate statements to patients.

28.     On February 16, 2010, Supervisor Carlson met with Mullen and Union President Kortum to discuss these reports.  Mullen stated the person who provided the reports had lied and was attempting to set him up.  Following the meeting, Mullen advised Supervisor Carlson that he was going to contact one of the patients involved in the reports in order to obtain a statement.  Supervisor Carlson instructed Mullen not to contact the patient.  Supervisor Carlson was informed the next day that Mullen had contacted the patient.

29.     On February 19, 2010, Mullen was rude and argumentative at a monthly clerk meeting.  Later, on February 19, Mullen stated to Supervisor Carlson that he was being harassed because of his EEO case, and stated he had filed another EEO complaint.

30.     On March 2, 2010, Supervisor Carlson received a report that Mullen made an inappropriate statement to a patient.  Supervisor Carlson met with Mullen and Union President Kortum to discuss the report.  Mullen stated he was going to contact the patient involved in the report to get a statement.  Supervisor Carlson ordered him not to contact the patient.  Mullen responded that he was going to contact the patient.

31.     In February and March 2010, there were several other conduct issues that warranted further discipline of Mullen, including failure to follow orders, failure to

6

follow procedures, and inappropriate comments toward patients. Supervisors Carlson and Miller submitted evidence of these issues to Bieker.

## Mullen's Termination

32.     On April 5, 2010, Bieker provided draft charges for proposed action against Mullen to Assistant Director Cindy Sestak ("Assistant Director Sestak"). The charges were that Mullen made inappropriate comments in the workplace to a veteran (two counts), failed to follow procedures, failed to follow his supervisor's instructions, failed to follow instructions, was rude and disruptive during a staff meeting, and engaged in conduct unbecoming a federal employee.

33.     Assistant Director Sestak was the official to propose removal actions for the facility. She reviewed the charges and proposed Mullen's removal.

34.     Associate Director Nancy Gregory ("Associate Director Gregory") investigated the charges and the evidence, requested additional evidence, and met with Mullen and his attorney. She ultimately determined removal from VA employment was appropriate.

35.     Director Al Washko accepted Associate Director Gregory's determination, and Mullen was terminated effective July 21, 2010.

(Filing No. 55 at CM/ECF pp. 2-27.)

## III.  ANALYSIS

### A.    Standard of Review

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-51 (1986). In passing upon a motion for summary judgment, the district court must view the facts in the light most

favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652-53 (8th Cir. 1997).

In order to withstand a motion for summary judgment, a nonmoving party must substantiate allegations with "'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles Cnty*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## B.   Mullen's Discrimination Claims

Mullen alleges Shinseki discriminated against him in the terms, conditions, and privileges of employment because of Mullen's race and gender. Mullen has not set forth any direct evidence of discrimination. Therefore, to avoid summary judgment, he must demonstrate a requisite inference of unlawful discrimination under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1086 (8th Cir. 2011).

Under the *McDonnell Douglas* framework, a plaintiff bears the initial burden of proving a prima facie case of discrimination. *Bearden v. Int'l Paper Co.*, 529 F.3d 828, 831 (8th Cir. 2008). To establish a prima facie case of race or gender

8

discrimination, a plaintiff must show that (1) he is a member of a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *Gibson v. American Greetings Corp.*, 670 F.3d 844, 853-54 (8th Cir. 2012). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged action. *Bearden*, 529 F.3d at 831. If the defendant can articulate a nondiscriminatory reason, the burden shifts back to the plaintiff to show that the defendant's reasons were merely a pretext for illegal discrimination. *Id.* at 831-32.

Here, Mullen cannot satisfy his burden with regard to the second element of his prima facie case; that is, he cannot show he was meeting his employer's legitimate expectations. The undisputed facts are that Mullen was insolent toward his supervisor, argued with coworkers and his supervisor, failed to follow his supervisor's direct orders, did not safeguard confidential patient information, made inappropriate comments to VA patients in the workplace, and failed to follow procedures. (Filing No. 54-1 at CM/ECF pp. 10-45.) Defendant's evidence shows that VA's policies authorize disciplinary action for employees who engage in misconduct, are abusive toward coworkers, use obscene or disrespectful language toward supervisors, and fail to protect patient identifying information. (Filing No. 54-3 at CM/ECF pp. 26-28.)

I note that Mullen received "fully satisfactory" work performance ratings from Supervisors Carlson and Miller in July and November of 2009. However, Supervisor Miller's Declaration sets forth that she and Supervisor Carlson gave him the rating

because they were in the process of addressing his conduct. (Filing No. 54-2 at CM/ECF p. 8.) In addition, VA procedures required that they implement a performance improvement plan and work one-on-one with Mullen *prior* to giving him an unsatisfactory performance rating. (*Id.*)

Even assuming Mullen could establish a prima facie case of race or reverse gender discrimination, Shinseki has shown there were legitimate and nondiscriminatory justifications for Mullen's reprimand, suspension, and termination. Shinseki's evidence is full of instances of Mullen's misconduct. In addition, Shinseki submitted portions of Mullen's deposition testimony. In this testimony, Mullen admits that he responded to Supervisor Carlson's instructions by stating, "this sucks" and "what the hell"; called her a "racist"; and responded to her request that he keep his voice down by stating, "this is how I talk, this is who I am." (Filing No. 54-7 at CM/ECF pp. 6, 9, 11.) Moreover, Shinseki showed that VA staff followed its written procedures when counseling, reprimanding, suspending, and removing Mullen. (Filing No. 54-3.) Finally, each disciplinary action was subject to a higher level of review within the VA and was consistent with VA policy. (Filing No. 54-2 at CM/ECF pp. 4-15; Filing No. 54-4 at CM/ECF pp. 2-8; Filing No. 54-5 at CM/ECF pp. 2-9.)

I find that Shinseki had a legitimate, non-discriminatory reason for his actions against Mullen. Mullen has not argued that Shinseki's reasons were merely pretext for discrimination. For the reasons set forth above, Mullen's claims of racial and reverse-gender discrimination are dismissed.

**C.      Mullen's Hostile-Work-Environment Claim**

Mullen alleges he was subjected to a hostile work environment at the Grand Island VA because of his race and gender.  To sustain a claim for hostile work environment, Mullen must show that: (1) he is a member of a protected class; (2) he was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the protected group status; and (4) the harassment affected a term, condition, or privilege of employment.  *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 991 (8th Cir. 2003).  The environment must be both objectively hostile as perceived by a reasonable person and subjectively abusive as actually viewed by a plaintiff.  *Malone v. Ameren UE*, 646 F.3d 512, 517 (8th Cir. 2012).

Mullen's Complaint does not set forth which of his 90 paragraphs of allegations support his hostile-work-environment claim.  He does not specify who harassed him or how he was harassed, much less explain how the harassment was related to his status as an African-American male.  (*See* Filing No. 1 at CM/ECF pp. 16-17.)  Assuming, as Shinseki has done, that it is his supervisors' actions in disciplining him that Mullen considers "harassment," he cannot sustain a claim for hostile work environment.

The undisputed facts are that Supervisor Carlson, and other managers at the Grand Island VA, counseled, reprimanded, suspended, and ultimately removed Mullen because he was insolent, disrespectful, rude and disruptive, made inappropriate comments in the workplace, and failed to follow procedures.  (*See*, *e.g.*, Filing No. 54-5 at CM/ECF pp. 5-6.)  Mullen made no attempt to show this court

that there is any nexus between his supervisors' actions and his status as an African-American male. In addition, the record is void of any objectively hostile or subjectively abusive behavior by Carlson or any other supervisor.

For these reasons, Mullen has failed to show that he was subjected to harassment, or that a causal nexus exists between Mullen's supervisors' actions and his protected group status. Therefore, Mullen's hostile-work-environment claim is dismissed.

**D.     Mullen's Retaliation Claim**

Mullen alleges Shinseki retaliated against him because he filed EEO complaints against Supervisor Carlson, and also because he completed a survey on April 22, 2010, wherein he stated Supervisor Carlson treated him differently on the basis of his race.

To establish a prima facie case of Title VII retaliation and survive summary judgment, a plaintiff must demonstrate (1) that he engaged in protected conduct; (2) a reasonable employee would have found his employer's retaliatory action materially adverse; and (3) the materially adverse action was causally linked to his protected conduct. *Wilkie v. Dept. of Health and Human Servs.*, 638 F.3d 944, 955 (8th Cir. 2011). If a plaintiff sets forth a prima facie case, the defendant may rebut the resulting presumption by articulating a legitimate, non-retaliatory reason for the adverse employment action. *Gibson*, 670 F.3d at 856-57. The plaintiff may then attempt to refute the asserted reason as pretext. *Id.*

12

Mullen's Complaint does not set forth which of Shinseki's actions he considers "materially adverse." I assume for the sake of analysis that it is his employer's actions in counseling, reprimanding, suspending, and removing him that Mullen considers retaliatory. However, as thoroughly discussed in my analysis of Mullen's discrimination claim, Mullen's employer and supervisors took these actions because Mullen was insolent, disrespectful, rude and disruptive, made inappropriate comments in the workplace, and failed to follow procedures.

Nothing in the record suggests that Supervisor Carlson or any other manager took any adverse employment action against Mullen in response to Mullen's EEO complaints. Indeed, the record shows that Supervisor Carlson issued Mullen a proposed reprimand *before* she learned that Mullen had filed a complaint against her. (Filing No. 54-1 at CM/ECF p. 14.) Evidence that an employer was concerned about a problem before the employee engaged in protected activity "undercuts the significance of the temporal proximity." *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827, 834 (8th Cir. 2002).

Even assuming Mullen had met his burden of establishing a prima facie case, Shinseki articulated a legitimate, non-retaliatory reason for the employment actions. Specifically, Shinseki showed that Grand Island VA management counseled, reprimanded, suspended, and ultimately removed Mullen because of his inappropriate behavior at work and his failure to follow VA policies and procedures. Mullen made no attempt to refute Shinseki's asserted reason as pretext. For these reasons, Mullen's retaliation claims are dismissed.

13

IT IS THEREFORE ORDERED THAT:

1.      Shinseki's Motion for Summary Judgment (Filing No. 53) is granted.

2.      Mullen's Complaint is dismissed with prejudice.

3.      A separate judgment will be entered in accordance with this memorandum and order.

Dated October 10, 2012.

                        BY THE COURT

                        _Warren K. Urbom_
                        _____

                        Warren K. Urbom
                        United States Senior District Judge

14